NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0307n.06

No. 17-6367

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 18, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| C. WILLIAM HELM, MB.BCHIR, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES |
| | ) | DISTRICT COURT FOR |
| ALLISON RATTERMAN, PH.D.; ANGELA | ) | THE WESTERN DISTRICT |
| KOSHEWA; PAMELA FELDHOFF, PH.D.; ELEANOR | ) | OF KENTUCKY |
| LEDERER, M.D., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: WHITE, DONALD, and LARSEN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Dr. C. William Helm, a former professor, clinician, and cancer researcher at the University of Louisville School of Medicine (University), appeals the district court's orders dismissing his 42 U.S.C. § 1983 due process claims and state-law claims against the University. We AFFIRM the dismissal of Helm's § 1983 claims, REVERSE the dismissal of his fraud-by-omission and remaining state-law claims, and remand for further proceedings.

## I.

In 2009, the University chose not to renew Dr. Helm's contract after a colleague, Dr. Doug Taylor, accused him of plagiarizing a portion of Taylor's National Institutes of Health (NIH) grant application in submitting his own Center on Environmental Genomics (CEGIB) grant application. *See Helm v. Eells*, 642 F. App'x 558, 560 (6th Cir. 2016) (*Helm I*). Taylor filed a confidential complaint in July 2009, in accordance with the University's Office of Research Integrity (ORI)

policy. The University's Research Integrity Ombudsperson, Dr. Robert Staat, reviewed Taylor's allegations, told Taylor that his complaint fell within the University's guidelines for research misconduct, and suggested that Taylor seek assistance from Defendant Dr. Allison Ratterman, the Director of the Research Integrity Program. Ratterman met with Taylor and asked Defendant Eleanor Lederer, the Associate Research Integrity Ombudsperson, to meet and discuss Helm's case. Dr. Edward Halperin, Dean of the School of Medicine, and Dr. Tracy Eells, Associate Dean for Faculty Affairs, also learned of the plagiarism allegation.

The plagiarism investigation continued into 2010. Ratterman consulted with Defendant Dr. Pamela Feldhoff, Associate Vice President for Research, and Defendant Angela Koshewa, University Counsel. In the fall of 2010, an inquiry panel was formed, which met on November 30. Helm was not notified of the ORI investigation until December 6, 2010. Two members of the inquiry panel determined the plagiarism allegation warranted further investigation and an investigation committee was formed, which interviewed Helm in May 2011. The University exonerated Helm of Taylor's plagiarism allegation in August 2011. *Id.* at 561.

Helm filed his first federal action in September 2014, alleging various violations of due process under § 1983 by Drs. Eells and Halperin. The district court dismissed the action, holding that Helm suffered no deprivation of his liberty interest in his reputation because he was able to find other employment soon after the University decided not to renew his contract, and had no legitimate claim of entitlement, and thus no property interest, in having his contract renewed or receiving a promotion. The district court further determined that although Helm had a property interest in having the University follow its research misconduct policy, also referred to as the ORI

policy, that claim was time barred under the one-year statute of limitations.[1] This court affirmed both determinations. *Helm I*, 642 F. App'x at 563, 565–68.

Helm filed the instant action on December 6, 2016. As pertinent here, Helm alleged that Defendants conspired to and did deprive him of Fourteenth Amendment due process protections by failing "to promptly notify him of the inquiry, prepare a charge, and offer him an opportunity to object to the inquiry panel composition—all things guaranteed in the ORI policy." PID 963. The ORI policy, which is derived in large part from federal regulations promulgated by the United States Public Health Service (PHS) for investigating research misconduct, is mandatory where PHS funds are involved. Helm claimed Defendants deprived him of the ORI protections by wrongfully classifying his CEGIB grant application as "internal"—that is, not involving PHS-supported research—which meant the University did not have to follow its ORI policy. PID 958, 961-62. Helm's complaint also alleged state-law claims of fraud and misrepresentation, intentional interference with prospective advantage, tortious interference with a contract, and breach of fiduciary duties.

Defendants filed a motion to dismiss for failure to state a claim, which the district court treated as a motion for summary judgment. The district court dismissed Helm's § 1983 due process claim as barred by the one-year statute of limitations, and dismissed his claim that Defendants conspired to deprive him of due process because he failed to establish an underlying constitutional violation. The district court denied Defendants summary judgment on Helm's fraud claim, affording him an opportunity to amend his complaint to plead fraud with particularity and thus "conform to the strictures of Rule 9(b)." PID 977. The district court also denied Defendants summary judgment on Helm's state-law claims of tortious interference with a contract,

---

[1] *Helm v. Eells*, No. 3:14-CV-00654-TBR, 2015 WL 1778367 (W.D. Ky. Apr. 20, 2014); *Helm v. Eells*, No. 3:14-CV-00654-TBR, 2015 WL 3849614 (W.D. Ky. Jun. 22, 2015).

interference with a prospective business advantage, and breach of fiduciary duty, noting that it would be premature to decide whether Helm is entitled to equitable tolling since he could amend his complaint.

Helm filed an amended complaint, alleging state-law claims of fraud by omission, tortious interference with a contract, interference with a prospective business advantage, and breach of fiduciary duty. On Defendants' motion to dismiss for failure to state a claim, the district court dismissed the fraud-by-omission claim on the basis that Helm failed "to plead any facts supporting a claim that he was induced to act by the Defendants' failure to disclose material facts to him," PID 1311, and the remaining state-law claims because "Helm failed to successfully plead a fraud-by-omission claim, [thus] there is no act of concealment to toll the statute of limitations," PID 1312.

Helm appeals both orders.

## II.

We review the district court's grant of summary judgment de novo, construing the evidence and drawing all reasonable inferences in favor of Helm, the nonmoving party. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). We also review de novo the district court's dismissal of Helm's amended complaint for failure to state a claim, accepting all material allegations as true and construing them in the light most favorable to Helm. *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 630 (6th Cir. 2013).

### A. TIMELINESS OF § 1983 CLAIMS

Kentucky substantive law governs in this diversity jurisdiction action. *See Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 442 (6th Cir. 2009). Kentucky's one-year statute of limitations applicable to personal-injury claims applies to Helm's § 1983 claim. Ky. Rev. Stat.

Ann. § 413.140(1)(a). Federal law governs when the limitations period begins to run; a § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015).

> "'A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence.'" [*Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005)] (quoting *Sevier* [*v. Turner*], 742 F.2d [262,] 273 [(6th Cir. 1984))]. In this objective inquiry, courts look "'to what event should have alerted the typical lay person to protect his or her rights.'" *Id.* (quoting *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000)). At that point, the plaintiff has a "complete and present cause of action," such that he can "file suit and obtain relief." *Wallace* [*v. Kato*], 549 U.S. [384,] 388, 127 S. Ct. 1091 [2007] (internal quotation marks omitted) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 [] (1997)).

*Johnson*, 777 F.3d at 843.

### 1.

Helm challenges the district court's determination that he knew or had reason to know of his claim that Defendants denied him due process by failing to comply with the ORI policy more than a year before bringing this action. We find no error.

Defendants maintain, and Helm does not dispute, that the ORI policy was readily available to him on the University's website, and that the ORI policy does not apply to every case of research misconduct:

> This policy is intended to carry out University of Louisville's responsibilities under the Public Health Service (PHS) Policies on Research Misconduct, 42 CFR Part 93. This policy applies to allegations of research misconduct (. . . plagiarism in proposing, performing, or reviewing research, or in reporting research results) involving:
>
> - An individual who, at the time of the alleged research misconduct, was employed by, was an agent of, or was affiliated by contract or agreement with this institution . . .; and
>
> - (1) PHS supported biomedical or behavioral research, research training or activities related to that research or research training, such as the operation of tissue and data banks and the dissemination of research information, (2) applications or proposals for PHS support for biomedical or behavioral

5

> research, research training or activities related to that research or research training, or (3) plagiarism of research records produced in the course of PHS supported research . . . .  This includes any research proposed, performed, reviewed, or reported, or any research record generated from that research, regardless of whether and application or proposal for PHS funds resulted in a grant, contract, cooperative agreement, or other form of PHS support.

> This policy and the associated procedures do not apply to . . . other types of violations of University research policy or misconduct in research.

> This policy and associated procedures will be followed when the University receives an allegation of possible misconduct.  The Executive Vice President for Research must approve any significant variation in procedure prior to its initiation.  Any change from normal procedures must ensure fair treatment to the subject of the inquiry or investigation.

> The policy and procedures are intended to protect the rights and regulations of those alleged to have committed research misconduct and those who make such allegations, while at the same time ensuring that the substance of all allegations will be assessed fairly and conscientiously.  Because the integrity of all research is of paramount concern to the University, those with knowledge of possible acts of research misconduct are encouraged to report . . . .

> These policies and procedures also provide for reporting research misconduct Investigations and Institutional actions to the *U.S. Office of Research Integrity*, and for cooperating with the Office of Research Integrity in its review of institutional actions and reports.

PID 24 (footnotes omitted).  The district court observed, "Put simply, the ORI policy applies when a person affiliated with the University is alleged to have engaged in misconduct related to PHS-supported research."  PID 962.

On October 12, 2015, the University responded to Helm's requests for admission in a related state-court action, *Helm v. University of Louisville*, Jefferson Circuit Court No. 15-CI-1410, stating that the research misconduct policy did not apply to Taylor's plagiarism allegation.

Helm deposed Defendant Ratterman on November 2, 2015 in the state-court action.  Ratterman testified that during her investigation she requested a copy of Helm's CEGIB grant from the University's Office of Grants Management but was told by that office that it did not have a copy because it was an internal grant.  Ratterman could not remember when she communicated with the Grants Management Office.  Ratterman testified that in an internal proceeding, "the

Institution would not have an obligation to follow the formal federal regulation," although the

University's ORI policy guided the investigation, with some exceptions:

> Q. Did [Dr. Taylor's] STTR grant application involve federal funds? PHS funds.
>
> A. His STTR grant was funded by the Department of Health & Human Services.
>
> Q. So that would be a yes, Dr. Taylor's grant involved Public Health Service's funds, right?
>
> A. His grant, yes.
>
> Q. Okay. His grant. Did Dr. Helm's CEGIB grant application involve federal or PHS funds?
>
> . . . .
>
> A. []Dr. Helm's CEGIB grant was classified as an internal grant.
>
> Q. By who.
>
> A. By [Judy Bristow of] the Office of Grants Management . . . . I asked her if she had Dr. Helm's CEGIB grant, and she said no, that is an internal grant . . . . So I asked her where I could get a copy.
>
> Q. When did you ask her this question.
>
> A I don't know. I don't have notes on that.
>
> . . . .
>
> Q. Isn't that the threshold question on a . . . research misconduct allegation? Don't you need to know first and foremost if Public Health Service's funds are involved?
>
> A. It's one of them, yes . . . . It's one of the elements that we collect, yes.
>
> Q. What are the others? What other element other than PHS funding do you need to know the answer to immediately get the process rolling?
>
> A. In this particular case, we needed the allegation formalized.
>
> Q. Okay. And if the allegation involved Public Health Service's support, would that be important?
>
> A. Yes . . . Because then it falls within the scope of the formal policy.
>
> Q. And if it does, what does that mean?
>
> A. Then the time lines apply.
>
> Q. Okay. Should, in hindsight, should that have been the first question, or one of the first two or three questions that you asked after you received the complaint from Dr. Taylor about Dr. Helm?
>
> A. I don't know.

7

Q. Why don't you know that? You're the Director of the Office of Research Integrity at the University of Louisville. Is that not a threshold issue on any allegation that comes into your office?

A. The Institution proceeded and my office proceeded based on the information we had at hand.

. . . .

Q. Okay. So you make a distinction. You're saying it [the Research Misconduct Policy] wasn't applicable, but it was handled in accordance with the Research Misconduct Policy; that's your testimony?

A. I don't read those as being inconsistent . . . We followed it as guidance, yes.

Q. So your testimony is that Dr. Doug Taylor's research misconduct complaint against Helm was . . . handled in accordance with the Research Misconduct Policy; is that correct?

A. We followed it as guidance, yes.

. . . .

Q. Were there any provisions in the Research Misconduct Policy that the University did not apply or use as guidance in the claim of Taylor against Helm?

. . . .

A. When the [inquiry] panel was seated, the panel was just seated, the respondent did not get to weigh in on the panel.

Q. So that would be an example of the University not using the policy as guidance, right?

A. Correct . . . .

. . . .

Q. What caused the University to not follow the guidelines in the Research Misconduct Policy as it relates to the claims against Dr. Helm?

A. I don't know.

. . . .

Q. What was your concern?

A. My concern [in September 2010] was that even though the Institution viewed Dr. Helm's grant as internal, core funding is federal in nature.

Q. Okay. That seems reasonable. But you had a problem, didn't you? If your concern was accurate in September of 2010, what was your problem? What . . . was your problem if your concern [was] that Dr. Helm's grant was federally funded?

MR. DILGER: She's not going to discuss that . . . . It's the advice of counsel.

8

> MR. OYLER [Helm's counsel]: No, I'm asking her before she went to her lawyer, what was your concern? What was your problem if your concern was accurate that Dr. Helm's grant may involve federal funds?
>
> What was the . . . Office of Research Integrity's problem if that – if your concern was true?
>
> A. The issue for the case [sic] would need to be reclassified.
>
> Q. Because the deadlines would apply, right?
>
> A. That is correct.
>
> . . . .
>
> Q. Why didn't you . . . have that same concern back in July or August of 2009 . . . . About whether or not Dr. Helm's research was federally funded.
>
> A. As I indicated before, the determination had been made that it was an internal grant.
>
> . . . .
>
> Q. Was there any prohibition from you talking to Dr. Helm in July or August or September or October or November or December of 2009 about the allegations against him?
>
> A. Was I specifically prohibited from talking to him?
>
> Q. Right. Yes.
>
> A. No.

PID 440-43.

On November 19, 2015, in the state-court action, Helm filed a "Motion to Recover Attorney Fees and Reasonable Expenses Incurred Regarding Defendant's [the University's] Improper Failure to Admit the Truth of Matters Asserted in Plaintiff's Requests for Admission," arguing:

> The University's claim [in response to requests for admission] that the Research Misconduct Policy 'was not applicable' to the plagiarism complaint against Helm was flatly contradicted by Ratterman in her deposition. Moreover, on July 12, 2009, Taylor told Dr. Robert Staat (the Research Inquiry Ombudsperson) that "a member of my department [Helm] used a copy of my recent NIH grant application . . . , without my knowledge or consent, to submit as his own research for funding." (Ex. H). The next day, Staat advised Taylor:
>
> > At first reading, this appears to be a case of plagiarism and <u>definitely falls under the guidelines for research misconduct</u> . . . .

> **The canard that the Research Misconduct Policy was "not applicable" to the research misconduct allegation made against Helm in 2009 consumed a disproportionate share of Ratterman's deposition. It is now undisputed—via Ratterman's deposition testimony and after much effort—that the Research Misconduct Policy "was applicable" to the plagiarism allegation against Helm.** "Under CR 37.03, an improper failure to admit the matter asserted, if the requesting party thereafter proves the truth of it, authorizes the trial court, upon the requesting party's application, to order 'the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney fees.'" *Rumpel* [*v. Rumpel*], 438 S.W.3d [354,] 360 [(Ky. 2014)].
>
> Rather than admitting the matters set forth in the requests for admission, the University opted, beginning in 2010, to engage in deception . . . . The University's deception has been exposed, and admitted to by Ratterman in her deposition.

PID 358-59 (bold emphasis added). The state court denied Helm's motion for attorney fees.

Discovery in the state-court action proceeded and, on January 13, 2016, the University disclosed a letter dated March 24, 2015 from the federal Office of Research Integrity, Division of Investigative Oversight (DIO) (the Garfinkel letter) to Ratterman, stating that Helm's case was brought to its attention "when the respondent alleged procedural deficiencies in the institution's handling of the matter and requested restoration of his reputation." PID 820, 964. The DIO concluded that Taylor's plagiarism allegation fell within its jurisdiction **because the source document of the alleged plagiarism was Taylor's NIH grant application, which involved federal funding**. PID 965. However, the DIO agreed with the University's determination that Helm had not committed plagiarism and closed its case with no further action.

### 2.

> The district court explained its statute of limitations ruling:
>
> Helm's [due process] claim against these [four] Defendants is analogous [to his claim in the first federal action]. He says they "denied Helm's property due process protections because they said the [ORI] policy was 'inapplicable' to Taylor's 2009 plagiarism claim against Helm." And as in *Helm I*, these Defendants argue Helm filed his claim too late.
>
> [] Helm filed his complaint on December 6, 2016, so in order for his § 1983 claims to be timely, his constitutional injury must not have become reasonably apparent until sometime after December 6, 2015.

Helm's purported injury is Defendants' alleged misclassification of Taylor's plagiarism complaint as "internal" rather than "external." If Defendants had correctly determined the complaint involved federal funding, Helm says, the University would have been required to strictly comply with the ORI policy and afford him all of its protections. As to Helm's § 1983 claims, then, the Court must determine when Helm knew or had reason to know Defendants misclassified his case.

Helm argues the earliest he could have been aware of his claims is January 13, 2016. On that date, the University disclosed for the first time the March 2015 letter from the federal Division of Investigative Oversight, in which DIO stated its conclusion that the 2009 plagiarism case did in fact involve PHS support [the Garfinkel letter]. Helm says the letter "demonstrates that the November and December 2015 sworn [deposition] testimony of Ratterman, Lederer, and Feldhoff, and the University's Decemver [sic] 7, 2015 pleading in *Helm v. U of L*, [was] demonstrably false and deceptive." "If Helm had timely received Garfinkel's March 2015 letter before the November and December 2015 discovery depositions of Ratterman, Lederer, and Feldhoff," Helm argues, "they could not have testified that the plagiarism claims alleged against Helm did not fall within the 'scope' of the Research Misconduct Policy. And Helm would have sufficient facts to immediately file his § 1983 claim."

However, there is ample evidence of record suggesting Helm should have realized Defendants classified his case as "internal" before the DIO letter was disclosed [on January 13, 2016]. Helm deposed Ratterman on November 2, 2015. During her deposition, Ratterman explicitly stated the University had not applied the ORI policy to Taylor's complaint against Helm because it was "an internal case." Standing alone, perhaps this testimony would not be enough to put Helm on notice that Defendants misclassified the complaint against him in 2009. But Ratterman's testimony does not stand alone. Helm also had prior knowledge of both the ORI policy and his allegedly plagiarized CEGIB grant. [T]aken together with Ratterman's testimony, these items should have signaled to Helm that Defendants got it wrong in 2009. Following Ratterman's deposition, Helm had all the necessary pieces at his disposal to discover his misclassification claim.

What's more, shortly after Ratterman's deposition, Helm demonstrated he had actual knowledge of Defendants' possible misclassification. On November 19, 2015, Helm filed a motion for attorney's fees in state court. In that motion, Helm stated, "The canard that the Research Misconduct Policy was 'not applicable' to the research misconduct allegation made against Helm in 2009 consumed a disproportionate share of Ratterman's deposition. It is now undisputed . . . that the Research Misconduct Policy 'was applicable' to the plagiarism allegation against Helm." Helm's November 19 legal filing dispels any notion that his claim for misclassification was unclear following Ratterman's deposition.

> To be sure, the 2015 letter from the federal DIO lends strong support to the notion that Defendants did in fact misclassify Taylor's complaint against Helm. But the issue presently before the Court is not whether Defendants' decision not to apply the ORI policy was correct. Rather, the issue is when Helm knew or had reason to know Defendants misclassified the complaint. Ratterman's November 2 deposition put Helm on notice of his claim, and Helm's November 19 motion confirms he had knowledge of that claim more than one year before he filed suit [on December 6, 2016]. His § 1983 claim is therefore time-barred.

PID 967-71 (internal citations omitted).

**3.**

Helm asserts that the district court incorrectly classified his § 1983 claim as challenging Defendants' determination to treat the plagiarism charge against him as "internal" rather than "external," because the ORI policy does not classify research misconduct claims as either internal or external. Appellant's Br. 33; Reply Br. 27. However, the district court used that description interchangeably with a description Helm does not challenge: that Defendants "denied Helm's property due process protections because they said the [ORI] policy was 'inapplicable' to Taylor's 2009 plagiarism claim against Helm." PID 968. Helm does not explain the difference, or further elaborate on how the court misconstrued his § 1983 claim.

Helm further asserts that at Defendant Ratterman's November 2, 2015 deposition, she testified falsely on a number of points, including that the plagiarism charge against Helm did not meet the "scope" of the University's ORI policy. But the excerpts of Ratterman's deposition quoted above show that her testimony was not so one-sided; she testified that the University's Office of Grants Management deemed Helm's grant internal and that she proceeded with the investigation accordingly, using the ORI policy as a guide. Importantly, Ratterman admitted at her deposition that in September 2010 she became concerned that the plagiarism charge had been misclassified. Helm accurately asserts that Defendants did not produce various communications with the federal DIO until well after Ratterman's deposition; Defendants did not produce the DIO

Garfinkel letter until January 13, 2016, more than two months after Ratterman's deposition. Defendants noted when they produced the letter that they received the Garfinkel letter after Helm had contacted the DIO. The Garfinkel DIO letter made clear a crucial point that apparently had escaped the parties—the classification of Taylor's plagiarism charge turned on whether the source grant, Taylor's, was federally funded. The same goes for Ratterman's February 2015 phone conversation with the DIO's John Butler, during which Butler advised that the DIO would have asserted jurisdiction in Helm's case. The University did not disclose this conversation until October 2016, again explaining that Ratterman spoke with Butler only after Helm had contacted the DIO.

Although relevant to discovery issues in the state-court case, these complaints are beside the point here, given that Helm does not effectively challenge the district court's determination that the state-court motion for attorney fees he filed on November 19, 2015 makes clear that he was aware that Defendants likely incorrectly categorized the plagiarism charge against him.[2] Under these circumstances, we agree with the district court that Helm was aware or should have been aware of his § 1983 claims at the latest on November 19, 2015.

**4.**

Helm asserts that his § 1983 claims nevertheless remain viable because the one-year statute of limitations should be tolled due to Defendants' concealment of Garfinkel's March 2015 letter.

When applying a state's limitation period, a federal court also applies the state's tolling rules. *See Hardin v. Straub*, 490 U.S. 536, 539 (1989) ("Limitations periods in § 1983 suits are to

---

[2] Helm's opening brief did not address his November 19, 2015 state-court motion for attorney fees. His Reply Brief asserts that the University's response to his motion for attorney fees, filed on December 7, 2015, argued that in order to determine whether an allegation of plagiarism falls within the University's ORI policy the relevant inquiry is whether the document containing the plagiarism, i.e., Helm's grant, involved PHS support, not whether the document plagiarized involved PHS support. Helm does not explain how the University's response changes the fact that his motion clearly evinces his awareness of a potential claim and that Defendants incorrectly determined that the ORI policy did not apply to Taylor's plagiarism charge.

be determined by reference to the appropriate state statute of limitations and coordinating tolling rules." (internal citation omitted)); *see also Helm I*, 642 F. App'x at 563. Kentucky's equitable tolling statute provides in pertinent part:

> When a cause of action . . . accrues against a resident of this state, and he by . . . concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the . . . obstruction shall not be computed as any part of the period within which the action shall be commenced.

Ky. Rev. Stat. Ann. § 413.190(2). Helm must show "some act or conduct which in point of fact misleads or deceives [him] and obstructs or prevents him from instituting his suit while he may do so." *Helm I*, 642 F. App'x at 563 (quoting *Munday v. Mayfair Diagnostic Lab., Ky.*, 831 S.W.2d 912, 914 (Ky. 1992) (internal quotation marks omitted)). The limitations period begins to run when the defendant's concealment is revealed or when the plaintiff "should have discovered his cause of action by reasonable diligence." *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 575 (Ky. 2009) (citations omitted).

Helm insists that if Defendants had timely produced the Garfinkel DIO letter, Ratterman could not have testified that the ORI policy did not apply to Helm. However, Ratterman did not testify that the ORI policy did not apply; she testified that she was told by the Office of Grants Management that Helm's grant application was internal, and that she proceeded on that assumption. No doubt the applicability of the ORI policy might have been clearer had Defendants produced the 2015 Garfinkel letter earlier, but "equitable tolling ends once plaintiff discovers his injury, at which point the statute of limitation resumes," *Helm I*, 642 F. App'x at 563 (citation omitted), and Helm's November 19, 2015 motion for attorney fees in state court makes clear that Helm should have discovered his cause of action by that point.

The district court correctly dismissed as time barred Helm's § 1983 due process claim and the claim that Defendants conspired to deprive him of due process.

14

## B. <u>FRAUD BY OMISSION</u>

The district court's order denying Defendants summary judgment on Helm's fraud claim permitted Helm to amend his complaint to plead fraud with particularity and noted that Helm failed to allege two necessary elements of fraud by omission: that Defendants had a duty to disclose material facts, and that Defendants' failure to do so induced Helm to act.

"[C]laims based on fraud pose 'a high risk of abusive litigation.'" *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007)). Federal Rule of Civil Procedure 9(b) provides, "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To maintain [his] fraud-by-omission claim under this standard, [Helm] must specify 'the who, what, when, where, and how' of the alleged omission." *Republic Bank & Trust Co.*, 683 F.3d at 255 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)). Specifically, Helm "must plead: (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what Appellees obtained as a consequence of the alleged fraud." *Id*. at 256 (citing *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

Helm's amended complaint alleged that "[b]y concealing the inquiry against Helm, Ratterman induced Helm (a) to not invoke the protections of the ORI Policy [or] any alternate research misconduct policy . . . and (b) to not protect his position and reputation at the University." PID 992.

Defendants' motion to dismiss argued in part that Helm could not establish the required element that he was induced to act because he pleaded only that he *failed to act* as a result of the

alleged fraudulent omissions. The district court agreed and dismissed the fraud-by-omission claim.

### 1.

Helm asserts that the district court, relying solely on *Bank of America, N.A. v. Corporex Companies, LLC*, 99 F. Supp. 3d 708 (E.D. Ky. 2015),[3] mistakenly held that "case law concerning

---

[3] *Corporex* states in pertinent part:

> To prevail on a fraud-by-omission claim, Bank of America must prove: (1) the defendants had a duty to disclose a material fact; (2) the defendants failed to disclose the fact; (3) the defendants' failure to disclose the material fact induced the Bank to act; and (4) the plaintiff suffered actual damages as a consequence. *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011). Because the Bank has not included sufficient facts showing that it was induced to act in a detrimental manner, this claim must be dismissed.

> Bank of America claims to have experienced only one consequence of Corporex Company's fraudulent omissions. R. 21 ¶ 76. Specifically, the Bank contends that it relied on omissions by "not taking immediate legal steps to enjoin or unwind the transfers or otherwise protect its interests." *Id*. But in order to succeed on its fraudulent omission claim, the Bank must show that it was somehow induced to act. Bank of America only pled that it failed to act as a result of the fraudulent omissions. As a matter of common sense and plain language, the facts in the complaint do not satisfy the third element of fraudulent omission.

> The Bank nevertheless argues that it can obtain legal relief on its claim, even though it admits that its conduct amounts to a failure to act. To support its counterintuitive reading of the word "induce," Bank of America points to an unpublished Kentucky court of appeals decision. See R. 26 at 12 (citing to *Pal Oil, LLC v. United Am. Energy, LLC*, No. 2011–CA–000744–MR, 2012 WL 5274652, at *29 (Ky. Ct. App. Oct. 26, 2012)). The Pal Oil court mentioned that the "inducement" element of a fraudulent omission claim includes decisions to "refrain from acting." 2012 WL 5274652, at *29.

> *Pal Oil* does not counsel changing the fraudulent omission cause of action in Kentucky. While the Court can predict how the highest state court may rule on an unsettled legal issue, doing so based on *Pal Oil* is not appropriate for three reasons. *See Melson v. Prime Ins. Syndicate*, 429 F.3d 633, 636 (6th Cir. 2005) (concluding that if state law is unsettled, a federal court can anticipate how the state's supreme court would rule on the issue). First, the Kentucky Supreme Court is clear that a plaintiff must be induced to act by a fraudulent omission; so there is no "unsettled" area of law. *See Giddings*, 348 S.W.3d at 747. Second, to the extent that the highest Kentucky court has not addressed the issue, the decisions of the state's intermediate courts carry persuasive weight. *See id*.; *see also Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Lukas v. McPeak*, 730 F.3d 635, 637–38 (6th Cir. 2013) (instructing courts to look to the holdings of appellate decisions). But there is no court of appeals decision or holding challenging *Giddings*' interpretation of fraudulent omission. *Pal Oil* did not determine whether a plaintiff can bring a claim after failing to act as a result of a fraudulent omission. Instead, the court reversed and remanded the finding of fraud because there was insufficient evidence of intentional fraud and reliance. *See* 2012 WL 5274652, at *29–36. The dicta in *Pal Oil* cannot support a finding

16

fraudulent misrepresentation that allowed a claim to survive where the plaintiff was induced *to refrain* from acting should not be applied to a case involving fraud by omission." Appellant's Br. 28 (emphasis added). Helm maintains that *Corporex* misstates Kentucky law on the inducement element in fraud-by-omission cases and contradicts decisions of Kentucky state courts, other Kentucky federal district courts, and this court.

## 2.

Kentucky law on fraudulent misrepresentation is clear that "a claimant may establish detrimental reliance in a fraud action when he acts *or fails to act* due to fraudulent misrepresentations," and "[a] person is entitled to damages resulting from *inaction* when an untrue statement is made with the intent to induce that person *to refrain from acting* so long as it can be demonstrated that the false statement produced the inaction." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999) (emphasis added) (citing 37 Am. Jur. 2d *Fraud and Deceit*, § 225 (1969)). However, fraud by omission is a distinct claim, the elements of which were set out by

---

that the Kentucky Supreme Court will expand liability under the fraudulent omission cause of action. *See Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (permitting federal courts to consider only the decisions of intermediate courts of appeal and the dicta of state supreme court opinions in resolving unsettled state law). Finally, any prediction on this issue should avoid expanding liability under state law. Finding defendants liable for fraudulent omissions where plaintiffs are either induced to act or fail to act will do just that. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) ("Furthermore, [w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path.").

Kentucky could have a policy justification for limiting fraudulent omission claims to only those plaintiffs who were induced to act by a defendant's fraudulent omission. Accordingly, there is no reason to expand the scope of this cause of action by announcing a new interpretation of its elements, absent any cues from the Kentucky Supreme Court. For this reason, Bank of America cannot proceed on its fraudulent omission claim by simply pleading that it failed to act as a result of the defendants' fraudulent omissions.

*Bank of Am., N.A. v. Corporex Cos., LLC*, 99 F. Supp. 3d 708, 716–18 (E.D. Ky. 2015).

the Kentucky Supreme Court in *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d

729 (Ky. 2011):

> "Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements." *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003). Fraud through misrepresentation requires proof that: (1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff. *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999). By contrast, a fraud by omission claim is grounded in a duty to disclose. *Republic Bank*, 707 F. Supp. 2d at 710 ("The gravamen of the tort is breach of a duty to disclose . . . .")[.] To prevail, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence. *Rivermont Inn*, 113 S.W.3d at 641. The existence of a duty to disclose is a matter of law for the court. *See Smith v. General Motors Corp.*, 979 S.W.2d 127, 129 (Ky. App. 1998). *See also* Restatement (Second) of Torts § 551 cmt. m (1977) ("whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court.")

348 S.W.3d at 747–48.

Relying on *Corporex*, the district court read *Giddings* as requiring that the plaintiff in a fraud-by-omission case establish that he was induced to act, and concluded that unlike in a fraudulent misrepresentation case, being induced to refrain from acting is insufficient. However, this reading of *Giddings* ignores that the court provided the same abbreviated statement of the inducement element in stating the elements of fraudulent misrepresentation, referring only to the defendant's intent to induce the plaintiff to act upon the misrepresentation, with no reference to the failure to act. In stating the elements of the two torts, the *Giddings* court was focused on the crucial distinction that fraud by omission requires proof that the defendant had a duty to disclose, while fraudulent misrepresentation does not. This is the only distinction identified in *Giddings*.

18

Section 551 of the Restatement (Second) of Torts, titled "Liability for Nondisclosure,"
provides in pertinent part:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce
> the other to act or refrain from acting in a business transaction is subject to the
> same liability to the other as though he had represented the nonexistence of the
> matter that he has failed to disclose, if, but only if, he is under a duty to the other
> to exercise reasonable care to disclose the matter in question.[4]

Restatement (Second) of Torts § 551(1) (1977).

Although *Giddings* cited comment m to § 551, our research yielded no Kentucky state-court decision expressly adopting § 551. Further, the parties cite no Kentucky state-court decisions directly addressing whether the inducement element of a fraud-by-omission claim is the same as the inducement element of a fraudulent-misrepresentation claim, and our research has yielded none.

As national treatises explain, however, the elements of fraud by omission "are the same as traditional fraud with one exception: a duty to disclose," 13 Bus. & Com. Litig. Fed. Cts. § 130.19

---

[4] The remainder of § 551 states:

> (2) One party to a business transaction is under a duty to exercise reasonable care to
> disclose to the other before the transaction is consummated,
>
> (a) Matters known to him that the other is entitled to know because of a fiduciary
> or other similar relation of trust and confidence between them; and
>
> (b) Matters known to him that he knows necessary to prevent his partial or
> ambiguous statement of the facts from being misleading; and
>
> (c) Subsequently acquired information that he knows will make untrue or
> misleading a previous representation that when made was true or believed to
> be so; and
>
> (d) The falsity of a representation not made with the expectation that it would be
> acted upon, if he subsequently learns that the other is about to act in reliance
> upon it in a transaction with him; and
>
> (e) Facts basic to the transaction, if he knows that the other is about to enter into
> it under a mistake as to them, and that the other, because of the relationship
> between them, the customs of the trade or other objective circumstances,
> would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2) (1977).

(4th ed.), and we have found no contrary authority, state or federal. A treatise on Kentucky law, Kentucky Jurisprudence, § 10-7, is in accord:

> (d) Lack of intent to induce
>
> It is a defense to an action for fraudulent misrepresentation *or concealment* if it can be shown that the person who made the representation had no intention to induce or influence the complaining party to act. It is an essential element of actionable fraud that the person sought to be charged must have intended to induce an act *or failure to act* by the complaining party. Thus, if the complaining party merely overheard a remark which was not intentionally directed toward him by the defendants and acted upon that statement to his detriment, there exists no liability on the part of the person charged as no actionable misrepresentation has occurred.

Ky. Jurisprudence, Ch. 10 § 10-7 (emphasis added). Several unpublished Kentucky state-court decisions support Helm's argument as well. *See PAL Oil, LLC v. United Am. Energy, LLC*, Nos. 2011-CA-000744-MR, 2011-CA-001120-MR, 2012 WL 5274652, at *29 (Ky. Ct. App. Oct. 26, 2012) ("[A] claim of fraud by omission is based upon a party's failure to disclose to another a fact that the party knows may justifiably induce the other to act *or refrain from acting*. *See, e.g.*, Restatement Second of Torts § 551 (1976) (cited in the context of fraudulent omissions in *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011))." (emphasis added)); *Foley v. Smith*, No. 2003-CA-000621-MR, 2004 WL 1102335, at *1 (Ky. Ct. App. May 13, 2004) (observing that a plaintiff establishes "an actionable case of fraud based upon suppression of a fact" by demonstrating, as to inducement, "that the failure [to disclose] induced the plaintiff to act or to refrain from acting").

The district court understandably focused on *Corporex*, *see supra* n.3, because it is the only case to address whether the inducement element of a Kentucky fraud-by-omission claim is met when the plaintiff asserts only that he was induced *not* to act, as Helm does here. But *Corporex* misunderstood *Giddings*; the sole distinction *Giddings* made between a fraudulent-

misrepresentation claim and a fraud-by-omission claim is the duty to disclose, which must be shown to prove the latter. 348 S.W.3d at 747–48.

Thus, the district court erred in dismissing Helm's amended complaint for failure to plead that he was induced to act. [5]

**3.**

Defendants ask that we affirm the dismissal of Helm's fraud-by-omission claim on other grounds, specifically, that he did not establish a duty to disclose and did not plead fraud with particularity. We decline to do so. As an initial matter, Helm's amended complaint pleaded fraud with particularity.

With regard to a duty to disclose, the four circumstances under Kentucky law in which the duty to disclose may arise are: (1) "from a confidential or fiduciary relationship," (2) where "provided by statute," (3) "when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure," and (4) "where one party to a contract has superior knowledge and is relied upon to disclose the same." *Giddings*, 348 S.W.3d at 747–48.

The district court suggested that Helm adequately pleaded a duty to disclose due to an alleged fiduciary relationship between the parties. We disagree. Under Kentucky law, a fiduciary "relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily invokes an understanding in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991); *see also Fiegles v.*

---

[5] We are puzzled by the dissent's position that we need not reach the fraud-by-omission issue that is squarely before us. The district court dismissed the fraud-by-omission claim solely on the basis that Helm failed to plead that he was induced to act, and both parties briefed the issue extensively on appeal. The dissent would avoid the sole issue that brought this claim to our court to begin with, and would vacate the dismissal and remand to revisit a different aspect of the claim. However, if the district court correctly decided the issue the dissent would decline to address, there is no basis to vacate the district court's dismissal of the claim and remand.

*TruServ Corp.*, 289 S.W.3d 544, 552 (Ky. 2009) ("A fiduciary, moreover, is one who has expressly undertaken to act for the plaintiff's primary benefit."). Such relationships "can be informal, but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other." *In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002) (applying Kentucky law).

Helm primarily relies on the ORI policy to establish a fiduciary duty. But Helm has not plausibly alleged a fiduciary relationship. Although the ORI policy requires protection of the rights and reputation of the accused, a similar duty is owed to the accuser. And, not only is the ORI policy designed to protect the individuals involved, but it also ensures that "the highest standards of integrity in all [the University's] research endeavors" are met. PID 1034. The ORI policy "promote[s] these objectives by establishing a framework of methods and principles for assessing and conducting inquiries and investigations regarding allegations or incidents of 'research misconduct.'" *Id.*

Further, the ORI policy "is intended to carry out University of Louisville's responsibilities under the Public Health Service (PHS) Policies on Research Misconduct, 42 CFR Part 93." *Id.* 42 C.F.R § 93.100(b) provides that "[i]nstitutions and institutional members have an affirmative duty to protect PHS funds from misuse by ensuring the integrity of all PHS supported work, and primary responsibility for responding to and reporting allegations of research misconduct."

These provisions show that Defendants' duties under the policy ran to several different persons and institutions; thus, Helm has not adequately shown that Defendants, through the ORI policy, promised to act primarily for his benefit so as to render them fiduciaries. *See Steelvest*, 807 S.W.2d at 485.

However, this conclusion does not doom Helm's fraud-by-omission claim. As noted above, Helm can establish a duty to disclose not only by showing a fiduciary relationship, but also

(1) where such a duty is "provided by statute," (2) "when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure," and (3) "where one party to a contract has superior knowledge and is relied upon to disclose the same." *Giddings*, 348 S.W.3d at 747–48. The district court noted that Helm argued that "there was a duty to disclose under the remaining three possible circumstances"; it explained, however, that "it is unnecessary for the [district c]ourt to analyze those arguments at this time considering that Helm met the requirement under the first circumstance." PID 1308 n.1. We leave it to the district court to address the duty to disclose on these alternative bases in the first instance on remand.

## C. HELM'S REMAINING CLAIMS

Regarding Helm's remaining state-law claims of interference with a contract, interference with a prospective business advantage, and breach of fiduciary duty, the district court explained that if Helm could state a claim for fraud by omission, equitable tolling might save these claims from being untimely. Since Helm's amended complaint may have adequately pleaded a fraud-by-omission claim the district court should address the remaining state-law claims on remand.[6]

## III.

We affirm the district court's order granting Defendants summary judgment on Helm's § 1983 due process claims, reverse the order dismissing his fraud-by-omission claim and remaining state-law claims, and remand for further proceedings consistent with this opinion.

---

[6] We decline to dismiss the remaining state-law claims for failure to state a claim, as Defendants urge, and leave the disposition of those claims to the district court.

LARSEN, Circuit Judge, concurring in part and dissenting in part. I join the majority in affirming the district court's dismissal of Helm's § 1983 claims as untimely. The majority also appropriately concludes that Helm has failed to establish a fiduciary relationship, one of four ways in which a plaintiff may show a duty to disclose under Kentucky law. *See Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747–48 (Ky. 2011).

Though Helm has not established a duty to disclose, an essential element of a fraud-by-omission claim, the majority nevertheless addresses the district court's ruling on another element of that claim—inducement to act. I would not reach that question. That issue presents an unsettled question of state law: whether Kentucky law recognizes a fraud-by-omission claim where the plaintiff contends that he or she was induced to refrain from acting. There is no reason for us to address that question now. Our resolution of the unsettled state law question may have no effect on the outcome; the district court may determine on remand that Helm cannot establish a duty to disclose, in which case his claim would fail. For these reasons, I would refrain from addressing the unsettled question of state law until a time when, if ever, it is squarely before us. *See Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (recognizing "that federal courts must proceed with caution when making pronouncements about state law" (internal quotation marks omitted)). Instead, I would vacate the district court's judgment regarding Helm's fraud-by-omission claim and remand for it to address first whether Helm has pleaded a duty to disclose. I, therefore, join all but Part II.B.2 of the majority opinion.